**Robert B. RHOADS, Jr., and Jane Drake Rhoads, his wife, et al., Plaintiffs-Appellants,**

v.

**VIRGINIA–FLORIDA CORPORATION et al., Defendants-Appellees.**

No. 72–1130.

United States Court of Appeals, Fifth Circuit.

March 8, 1973.

Rehearing Denied May 29, 1973.

---

Richard F. Ralph, Miami, Fla., for plaintiffs-appellants.

Daniel Neal Heller, Miami, Fla., Mark Silverstein, Miami Beach, Fla., Knight, Underwood, Peters, Hoeveler & Pickle, William M. Hoeveler, Miami, Fla., for defendants-appellees.

Before GODBOLD, DYER and CLARK, Circuit Judges.

GODBOLD, Circuit Judge:

This case concerns erosion damage to the Florida residential beach-front property of plaintiffs, caused or substantially contributed to by the construction of a seawall for a beach-front high rise apartment complex. The property faces the Atlantic Ocean in the Golden Beach area of South Florida, at or near the intersection of the beach with the Dade-Broward county line. Defendants are the corporate lessee, builder, mortgage assignee and indenture trustees of the apartment complex. Plaintiffs are the owners of residential lots lying successively to the south of the apartment complex, the lot of the most northerly plaintiff being adjacent to the south boundary of the apartment property.

Plaintiffs brought this diversity suit for an injunction, damages and an order requiring removal of the seawall. Following a nonjury trial the District Judge found that defendants were entitled to judgment although the seawall substantially contributed to the erosion of plaintiffs' properties. His premise was that the defendants were not liable if they had built the wall on property owned by them, that is, landward (west) of the mean high water mark (MHWM), which is the boundary between the privately owned apartment property and the state sovereignty soil seaward thereof. He found that the wall was built landward (west) of the MHWM, and, accordingly, denied relief to plaintiffs.

The central issue at the trial was the location of the seawall vis-a-vis the MHWM. The case must be reversed because the finding that it was located landward of the MHWM was based in part upon the content of three drawings which could not be utilized by the court for that factual determination because they had not been verified. The three documents are defendants' exhibits 38, 40 and 49 (D.38, D.40 and D.49). D.38 and 40 purport to be surveys of the

apartment complex property by Maurice E. Berry, a registered surveyor, the former drawing purporting to show along the beach side of the property the actual location of the MHWM, the latter purporting to show along the beach side a proposed location for a seawall. D.49 is labeled as a tentative layout drawing (dated 1953) of a proposed city bulkhead line, made by a named firm of engineers and surveyors and containing a line labeled as mean high water mark.

1. Use of the drawings as evidence

D.38, 40 and 49 were offered into evidence without any stated limitation on the purposes for which offered. Plaintiffs had acknowledged their authenticity but pointed out that authentication only identified the documents as having been prepared by the purported authors. Plaintiffs repeatedly objected to admission on the ground that there had been no testimony by the authors or by persons participating in the preparation of the surveys concerning what the drawings purported to show. Plaintiffs urged that without such testimony the documents were meaningless, and that they were entitled to cross-examine the authors.

The court admitted the drawings without any stated limitation on their use and without any testimony from their authors, and, as we have said, utilized their content in its dispositive finding that the seawall was located landward of the MHWM.

The error was critical because plaintiffs introduced without objection P.31,[1] the McGill survey, made by a state-employed surveyor for an agency of the State of Florida, which located the MHWM considerably landward of the locations which the court believed were shown by D.38, 40 and 49.

Since Rule 43(a) Fed.R.Civ.P. requires evidence to be admitted in a diversity case if admissible under federal

---

1. Since there was no objection, we need not decide whether this drawing was adequately verified. There was at least a partial verification by a witness who, though not the author, had participated in the on-the-ground measurements, and gave testimony concerning the survey.

statutes, federal equity practice, or state statutes, rules or common law,[2] we necessarily have engaged in a search of the authorities much broader in scope than the nominal assistance afforded us by the parties.

 As urged by plaintiffs at the trial, authentication of the documents merely established their authorship, the proof of some human's "personal connection with a corporal object." 7 Wigmore, On Evidence § 2129, at 564 (3d ed. 1940). See also McCormick, Evidence § 218, at 543 (2d ed. 1972). Before the documents could be admitted for "testimonial use," [3] that is, where the documents themselves would "testify" as direct[4] evidence on a material disputed issue of fact, they were required to be verified. "[W]henever such a document is offered as proving a thing to be as therein represented, then it is offered testimonially, and it must be associated with a testifier." 3 Wigmore, On Evidence § 790, at 218 (Chadbourn ed. 1970). Verification required at the minimum a showing by the testimony of some competent witness that the lines of the drawings were correct representations of the actual physical characteris-

tics of the land and objects which they purported to show. Adams v. State, 28 Fla. 511, 10 So. 106 (1891); Florida Southern Ry. Co. v. Parsons, 33 Fla. 631, 15 So. 338 (1894); Patterson v. State, 128 Fla. 539, 175 So. 730, 731 (1937); Turner v. U. S., 66 F. 280 (5th Cir. 1895); 3 Wigmore, On Evidence § 793 (Chadbourn ed. 1970). See also Johnston v. Jones, 1 Black 209, 66 U.S. 209, 17 L.Ed. 117 (1862).

The significance of verification is demonstrated by what we do not know in this case. There was not even generalized testimony that the drawings accurately depict the property or the description and locations of monuments presumably used as starting points, and there is no evidence of the competency of the surveyor or of the manner in which the drawings were prepared. There is no evidence that lines, calls and monuments portrayed on the drawings were based on or tied in to, or derived from, an official survey or the oldest private survey.[5] We do not know that on-the-ground measurements were made, and, if they were, when made and by whom and whether accurately done, and whether measured data was correctly transferred onto the drawings.[6]

---

2. See Monarch Ins. Co. of Ohio v. Spach, 281 F.2d 401, 409–410 (5th Cir. 1960); Dallas County v. Commercial Union Assurance Co., 286 F.2d 388 (5th Cir. 1961); 5 Moore, Fed. Practice ¶ 43.02 [4], at 1317–20 (2d ed. 1971).

3. Not to be confused with the more limited use of documents to explain testimony of a human witness.

4. By "direct" evidence we do not refer to the direct/circumstantial evidence distinction but to the difference between use of the subject matter shown by a document as evidence of a material disputed fact, and limited use of a document to explain the testimony of a witness.

5. These were private drawings. In Florida a private survey can be used as direct evidence on a material issue if shown to be a resurvey tieing into or based on lines, calls and measurements previously established by the official United States government survey, if there is one, and if not, the oldest private survey under which

property rights in the area were originally acquired. Miller v. White, 23 Fla. 301, 2 So. 614 (1887); Froscher v. Fuchs, 130 So.2d 300 (Fla.App.1961).

6. The mean high water level is a computed elevation figure relating to differences between tides and to the tide cycle. For a survey such as D.38, the MHWM would first be computed and then graphically plotted upon a drawing displaying the varying elevations of the seashore terrain. The beginning point for the computation is a figure obtained from a United States government agency. The computation is no better than the beginning figure. The significance of verification in this respect is displayed by the fact that plaintiffs discovered that McGill appeared to have departed slightly from the governmental beginning figure, and plaintiffs then offered considerable evidence attempting to extrapolate the correct mean high water level (which, they claimed, was even further landward than McGill's survey showed it to be).

■ Generally, when a survey is to be used as direct evidence the author appears, establishes his competency, and testifies to the accuracy and the manner of his work. Playa de Flor Land & Improvement Co. v. U. S., 70 F.Supp. 281 (D.C.Z.), decree modified and affirmed, 160 F.2d 131 (5th Cir. 1947). Neither Berry, the author of D.38 and 40, nor the unidentified author of D.49, appeared and testified. One who participated in the survey and can attest to its accuracy may be able to verify it if the author is acknowledged to have been competent. *See, e. g. Id.* at 304. No participant in the work underlying D.38, 40 or 49 so testified. We set out in a footnote some of the cases in which there have been efforts at verification, but the efforts have been held insufficient in degree to make maps or drawings admissible as documents which themselves "testify." [7]

■■ It is possible, through exceptions to the hearsay rule, for a survey to receive requisite verification without in-court appearance by a person whose testimony would verify it.[8] None of the exceptions have been shown in the trial court or in this court to be applicable to D.38, 40, and 49. Defendants' drawings were made by private persons acting in a private capacity and thus were not within the official written statements exception to the hearsay rule.[9]

■ Two of the three documents bore what purported to be a certificate of Berry, as a registered Florida land surveyor. We have found no basis for concluding—and defendants have referred us to none—that the certificates themselves gave to the documents an official character or otherwise verified their contents. The certification itself lacked the necessary verification to be admissible as a hearsay exception. Without statutory authorization it could not provide verification for the document on which it appeared.

■ Defendants have not claimed that the three drawings were admissible under federal or state business record statutes, 28 U.S.C. § 1732, Fla.Stat.Ann. § 92.36, and in our opinion they were not admissible under either.

Since D.38, 40 and 49 were not admissible for testimonial purposes, that is to

7. Cooper v. State, 274 Ala. 683, 151 So.2d 399 (1963). In a proceeding where precision and strict accuracy were relevant to establish a boundary, an authenticating witness testified that the exhibit accurately depicited appellants' property, but stated he did not personally survey the property, was not present when it was surveyed, and was not a land surveyor himself. This predicate was held insufficient.

Stein v. Ashby, 24 Ala. 521 (1854), 9 A.L.R.2d 1044, 1083 (1950). There was some verification by testimony that the map was generally recognized as a correct representation of what it purported to show. This was held insufficient to make the map admissible to show important details although the surveyor was known and shown to have been competent.

Banks v. Watrous, 134 Conn. 592, 59 A.2d 723 (1948), 4 A.L.R.2d 286 (1949). The testimony of the map's author, a civil engineer, that rather than performing a physical survey he had drawn boundary lines on the map on the basis of plaintiff's representations to him and of an aerial survey in the tax assessor's office, was insufficient to permit admission of the map as direct evidence of plaintiff's boundary, which was the dispositive issue in an action for wrongful cutting of trees.

See also Aronson v. McDonald, 248 F. 2d 507, 17 Alaska 395 (9th Cir. 1957); Maples v. Hoggard, 58 Ga. 315 (1877); Golden v. Rollins, 266 Ala. 640, 98 So. 2d 409 (1957).

8. Wigmore cites the examples of the map of an official surveyor and a map prepared in the regular course of business by a person now deceased. 3 Wigmore, On Evidence § 791, at 227 (Chadbourn ed. 1970).

9. See Fla.Stat.Ann. § 92.32 and 28 U.S.C. § 1733. Cf. Rule 803(8), Fed.Rules of Evidence, effective July 1, 1973.

Courts and legislatures generally have distinguished between surveys prepared by officials, which are presumed to be more trustworthy, and surveys prepared by private surveyors. See Simmons v. Spratt, 20 Fla. 495, 499 (1884); 5 Wigmore, On Evidence § 165, at 656 (3rd ed. 1940); and 46 A.L.R.2d 1318, 1319, 1336, 1338 (1956).

"testify" themselves concerning the location of the seawall vis-a-vis the MHWM, the allowable range of discretion permitted the trial court under Rule 43(a), Fed.R.Civ.P., did not permit it to admit them and then employ them for a testimonial—and, in this instance, dispositive—purpose.

■ The defendants seek the sanctuary of authorities allowing the use of documents to explain and illustrate the testimony of witnesses who refer to them. Authenticated documents can be employed in such a limited and ancillary manner, e. g., Florida Southern Ry. Co. v. Parsons, supra; Turner v. U. S., supra; 13 Fla.Jur., Evidence § 340. However, as the Supreme Court of Alabama explained in Crocker v. Lee, 261 Ala. 439, 74 So.2d 429 (1954):

> The use of a map, drawing or plat for purposes of illustration must be distinguished from its admission in evidence. In the latter case the instrument possesses within itself evidential characteristics tending to establish a particular fact. In the former case the testimony of the witness is the evidence and the map or diagram is merely an aid to its understanding (citations omitted).

74 So.2d at 435. In the case before us the three drawings were not offered, admitted or utilized for the limited and ancillary purpose of explaining oral testimony of witnesses who referred to them.

■ The defendants rely also upon a conclusion of law and finding of fact entered by the court to this effect: if a purchaser desires to acquire property by deed or long-term lease for a specific project, causes a survey to be made by a registered surveyor and acquires the property in reliance thereon, and proceeds with reasonable dispatch to erect improvements on the property, then he "has a right to rely upon his property line as established and existing by the said survey." For reasons already discussed, this theory would fail at the threshold since the purported survey on the basis of which defendants purchased was not admissible without verification. But we discuss the theory because it may arise again on retrial. The court cited no authority in support of its proposition. The defendants refer us to one case, Wildeboer v. Hack, 97 So.2d 29 (Fla.App.1957), but it concerns an official government survey, which, under Florida law, "creates" boundaries and does not merely "ascertain" or "designate" them,[10] and is, therefore, conclusive in a boundary dispute. Mexico Beach Corp. v. St. Joe Paper Co., 97 So. 2d 708, 709 (Fla.App.1957); Bishop v. Johnson, 100 So.2d 817, 819 (Fla.App. 1958). If the trial court's statement is construed to mean that a purchaser who acquires real property in reliance upon a private survey may, without adverse legal consequences, improve and construct within the boundaries as reflected by the survey, regardless of whether the surveyor has correctly located the boundaries, we have no hesitation in saying it is erroneous. Adjoining landowners, including the sovereign who holds land for all, may not be deprived of title or dominion over their property in that manner.[11]

10. We construe the Florida courts' distinction between "create" and "ascertain or designate" to mean that in Florida an official government survey conclusively establishes boundaries and does not merely provide evidence of their location which may be contradicted by other evidence.

11. Cf. Watrous v. Morrison, 33 Fla. 261, 14 So. 805 (1894), (even if contiguous owners agree to hire a private surveyor to settle their boundary dispute they are not estopped to challenge as erroneous the line located by that survey, and a nonconsenting owner or one who takes under him will not be bound by the agreement of the other owners as to a boundary line between coterminous tracts); Bozeman v. Roberts, 188 So.2d 23, 24 (Fla. App.1966) (where a private surveyor failed to follow the official U.S. government survey, the property owners may repudiate their agreement to abide by that survey and challenge its correctness by introducing another private survey.)

## 2. Finding No. 4

It is necessary that we comment upon the District Court's Finding No. 4, that whether the Berry survey [D.38] or the McGill survey is used to locate the MHWM "makes no difference at all in the damages caused to the plaintiff and to other residents of Golden Beach, nor in the destruction of the land of the State of Florida lost from the Golden Beach Area." We are unsure what this means. It may refer to cause in fact, that is, that the wall, without regard to whether it is located by the one document or by the other, was the actual cause of the damage. Such a finding would be a reaffirmation of what the court already had found orally[12] and would not be clearly erroneous.[13]

Secondly, the court may have meant substantially the obverse of the foregoing, that is, that regardless of the location of the wall it was *not* the actual cause of the damage. Based on the overwhelming evidence and also for reasons stated above, this construction would be clearly erroneous.

■ Another possible interpretation is that although the wall was the actual cause it was not the proximate cause of plaintiffs' damage. As Florida recognizes, the wrongful act of a tort feasor may be a proximate cause and liability may attach even though the act's causal contribution to the resulting injury is commingled with natural forces which, because foreseeable, are not efficient intervening causes. See, *e. g.,* Town of De Funiak Springs v. Perdue, 69 Fla. 326, 68 So. 234 (1915); Benedict Pineapple Co. v. Atlantic Coast Line R. Co., 55 Fla. 514, 46 So. 732 (1908). Given actual causation, a finding in this case of lack of proximate cause would be clearly erroneous.

Finally, the court may have intended to say that both the McGill survey and D.38 showed that the wall was built "legally", in the sense of landward of the MHWM. Such a finding could not stand. Neither the McGill survey nor

---

12. The District Court had earlier stated as a preface to oral rendition of its judgment: "There is no question about the complete destruction and severe erosion that was at least substantially contributed to by the seawall in question, or would have been the result of any wall of a similar nature."

Later because of unidentified "clerical mistakes", a written "corrected final judgment" was substituted for the oral judgment. It contains no finding of causation, unless Finding No. 4 is so construed.

13. During the trial the court referred to the possibility that a wall could be constructed landward of the MHWM but so close to the MHWM that it would be touched by the moving sea from time to time, and that impact of the sea on such a "legal" wall might have produced the same damage to the beaches as actually occurred. Therefore, possibly the court meant to say in Finding No. 4 that even if defendants built seaward of the MHWM (as the McGill survey tends to show), defendants nevertheless would not be legally liable because the same harm would in any event have been caused had defendants acted in a legal manner by building landward of the MHWM, i. e., the improper location of the wall was not a cause in the "but for" sense. This interpretation could not stand. It would be inconsistent with the oral statements of the court concerning actual causation. See note 12, *supra.* Also it is entirely speculative whether, if plaintiffs had chosen a site for the wall above the correctly-located MHWM—wherever that might be—that they would have chosen a location touched by the usual reach of the water. They might have elected to move inland above the usual reach of the sea, or they might have moved to a different type of construction, or even have abandoned the wall project as not economically feasible. The exclusion of "but for" cause cannot be predicated upon what defendants might or might not have done within a wide range of possibilities. Finally, this interpretation would run counter to the possibility of liability for the consequences of a wall built on defendants' property, wherever built, if not built to protect the property from the "common enemy," the sea. See part 3, *infra.*

D.38 purports to show the wall but only the MHWM. If D.40, which purports to show the wall as constructed (but was, of course, not properly before the court), is superimposed upon McGill's survey, the wall falls seaward of the MHWM as shown on the McGill survey, not landward.

Thus, given any of the possible meanings which appear to us, the "it makes no difference" finding is not inconsistent with our conclusion that the case must be reversed.

### 3.

The District Court should consider on remand the question of whether under Florida law a littoral landowner has an unqualified right to construct a seawall on his property (i. e., landward of the MHWM), and if there are qualifications, what they are and enter Conclusions of Law accordingly.

In this instance the purpose of the wall was to improve defendants' property, not to protect it from the "common enemy," the sea. Katencamp v. Union Realty Co., 6 Cal.2d 765, 59 P.2d 473 (1963), holds that if a littoral landowner constructs a wall on his property to save his property from destruction by the sea, such use of his property is as a matter of law a reasonable use, and, therefore, is not actionable even if an adjoining landowner's property is damaged by the use; but if he builds the wall, though on his own land, to improve the property, then the use is not as a matter of law reasonable, and the court must analyze the facts to reach a conclusion on the issue of reasonableness. The rule in Massachusetts appears to be the contrary. Jubilee Yacht Club v. Gulf Refining, 245 Mass. 60, 140 N.E. 280 (1923), holds a littoral owner can construct seawalls on his property without limitation. We find no Florida cases on the matter, and the question is one for the Florida trial judge in the first instance.

Reversed and remanded.