Robert B. RHOADS, Jr., and Jane Drake Rhoads, his wife, et al., Plaintiffs-Appellants,

v.

VIRGINIA–FLORIDA CORPORATION, et al., Defendants-Appellees.

No. 74–1576.

United States Court of Appeals, Fifth Circuit.

March 31, 1977.

Rehearings Denied May 9, 1977.

Richard F. Ralph, Miami, Fla., for plaintiffs-appellants.

Daniel Neal Heller, Robert Golden, Miami, Fla., for Virginia-Fla.

William M. Hoeveler, Miami, Fla., Mark Silverstein, Miami Beach, Fla., for J. Parker Construction.

Before AINSWORTH, GODBOLD and SIMPSON, Circuit Judges.

GODBOLD, Circuit Judge:

This diversity suit charges negligence and nuisance in the construction and maintenance of a seawall by defendants, causing or contributing to erosion damages to plaintiffs' residential beachfront properties located in Florida. In the original nonjury trial the court found that the seawall substantially contributed to the erosion of plaintiffs' properties. The trial court proceeded on the premise of law that the defendants were not liable if they had built the wall on property owned by them, that is, landward (west) of the mean high water mark (MHWM), which is the boundary between privately owned property and the state sovereignty soil seaward thereof. The court found that the wall was built landward (west) of the MHWM, and, accordingly, denied relief to plaintiffs.

On appeal we reversed and remanded because surveys relied upon by the court, D. 38, 40 and 49, were not properly verified. 476 F.2d 82. On remand the defendants presented additional testimony in an attempt to verify the surveys erroneously admitted into evidence at the first trial. The court held D. 38, 40 and 49 were admissible. Based on the evidence at the first and second trials, the court held that defendants' seawall was constructed landward of the MHWM and again found for defendants. The decision must again be reversed.

First, as to verification. M. E. Berry, Jr., a registered surveyor, testified that D. 38 and 40 were survey drawings prepared by his office based on field notes compiled by Frank Harrison, chief of the survey party which made the actual physical measurements represented on the drawings. He further testified that he checked the completed drawings against Harrison's field notes. Harrison himself testified as to his participation in and on-site direction of the actual survey. .

Berry's and Harrison's testimony was sufficient to trace the reliability of D. 38 and 40 with respect to the making of measurements by the crew, the recording of field data in field notes, and the conversion of that data into line drawings. D. 38 and 40

were admissible.[1] The difficulty is that the purported ground location of the MHWM, which was measured and then recorded in field notes and exemplified in the drawing, was nothing more than a rough estimate. No established monuments showed its location, which was not determined by measurements from any point whose location was established, nor was it established by mathematical calculation. Harrison testified that he "estimated or eyeballed" the location of the MHWM by observing "where the high water is from the seaweed and debris that is washed up on the shore," and by looking at "the varying points . . . where the high water has been." He recognized that he could have located the MHWM by an alternative method of "establishing an elevation." Thus, according to the testimony, D. 38 and 40 reflect measurements made by the crew but they do not reflect the true location of the MHWM with any more accuracy than the original "eyeball estimate" made on a single occasion on one day.

We pointed out in our early opinion what the MHWM is:

The mean high water level is a computed elevation figure relating to differences between tides and to the tide cycle. For a survey such as D. 38, the MHWM would first be computed and then graphically plotted upon a drawing displaying the varying elevations of the seashore terrain. The beginning point for the computation is a figure obtained from a United States government agency. The computation is no better than the beginning figure.

476 F.2d at 85 n.6. The MHWM is an average sea plane covering the course of 19, or sometimes 18.6, years.[2] Harrison's rough estimate was, by his own testimony, accurate to "certainly within ten feet, probably within five feet." The inexact location shown for the MHWM in this case cannot support the court's conclusion on remand that the seawall was landward of the MHWM.[3] A rough estimate of MHWM location might be sufficient for other circumstances. But in this instance the defendants built the wall at least as far seaward as up to, or almost up to, the MHWM as shown on D. 38, and at no point more than a few feet inland of it.

The significance of D. 38 is seen when the relative locations of seawall and MHWM, as reflected by the relevant exhibits, are tracked. D. 38 contains the only evidence of the location of the MHWM as of 1967, but it does not show the seawall. D. 40, almost contemporaneous in time, shows the seawall but not the MHWM. Reading these exhibits together with D. 32, another survey (which went in without objection), they show that the east (seaward) end of defendants' north property line, the north end of the seawall, and the intersection of the MHWM with defendants' north line, are the same common point. From that point

---

1. D. 49 was not verified by the testimony of any participant in the survey on which it was based. Witness Reeves testified that he had hurriedly (and only partially) checked the drawing against the field notes of the surveyor. This was not enough. It was, however, harmless error to admit D. 49, which purported to show the MHWM as of July 18, 1953, and a proposed city bulkhead line, neither of which is of major significance in the case.

2. *See* Gay, *The High Water Mark: Boundary Between Public and Private Lands,* U. of Fla. Law Review, 18:553 (1966).

3. The *"ordinary* high water mark" has been defined by the Florida Supreme Court as "the limit reached by the daily ebb and flow of the tide, the usual tide, or the neap tide that happens between the full and change of the moon."

*Miller v. Bay-to-Gulf, Inc.,* 141 Fla. 452, 193 So. 425 (1940) (emphasis added). *See also:* "Marks upon the ground . . . may be considered in connection with competent testimony and other evidence in determining the true line of *ordinary* high-water mark." *Martin v. Busch,* 93 Fla. 535, 112 So. 274, 283 (1927) (emphasis added). We assume that the "ordinary high water mark" is determined by measurements made over a shorter time span than the MHWM. In any event, whatever the precise relationship between MHWM and "ordinary high water mark," there is no evidence what the phase of the moon was when Harrison "eyeballed" the debris on the beach, and Harrison did not claim to use debris and marks as substantiation of other evidence but as the sole sources of his estimate.

the southerly course of the seawall (319.35 ft.) terminates approximately 8 feet inland of the intersection of the MHWM with the east (seaward) end of defendants' south property line. In short, the seawall is shown to be on the MHWM (at defendants' north line) and never further inland than 8 feet from the MHWM (at defendants' south line). In the context of these close quarters, the approximation method used to "locate" the MHWM was not a sufficiently exact means to serve as the predicate for a judicial determination of the relative locations of seawall and MHWM.

Plaintiffs' evidence is no better. Carleton, a supervisor for the Florida Department of Beaches, testified that he observed the wall during its construction in the spring and summer of 1968 and believed it to be an encroachment on state-owned tidal lands. Neighbors of plaintiffs testified that the wall was built "in the water." Considered in isolation this might tend to prove that the wall was seaward of the MHWM, but there was other testimony that in January or February of 1968 defendants pushed sand or other material into the ocean at the south end of their property, creating a washout which materially changed the shoreline. Thus observations of the relation of the altered shoreline to the subsequently constructed wall are of little or no value.

The end result after two trials is that one cannot tell with any real assurance the precise relative locations of seawall and MHWM—plaintiffs have not located the MHWM and defendants rely upon Harrison's "eyeball" estimate. The most one can conclude is that the seawall and the MHWM are in close proximity to each other. Proof that the wall is seaward of the MHWM is essential to plaintiffs' theory that the seawall was illegally located on state property. The burden of adducing that proof is upon plaintiffs, and they have not discharged it. That theory drops out of the case.

But this is not all. In Part 3 of our prior opinion we directed that on remand the district court consider whether under Florida law a littoral landowner has an unqualified right to construct a seawall on his property (landward of the MHWM), and if there are qualifications on his right what they are. On remand the district court made a finding that it was "necessary" for defendants to build the wall to prevent erosion of their property, that is, the beach was eroding and a wall was requisite to halt the erosion process.[4] The court made no finding that halting erosion was the defendants' *purpose* in erecting the wall. In the prior appeal we had said that "the purpose of the wall was to improve defendants' property, not to protect it from the 'common enemy,' the sea." 476 F.2d at 89. On remand the district court noted that in the original trial it had made no findings of fact or law on the "common enemy" theory. We take this to mean that the court viewed our appellate reference to defendants' "purpose" as an issue of fact which should be considered initially at the trial level rather than for the first time on appeal. In view of this statement by the district court, and of its finding that the seawall was "necessary" to protect defendants' property from a process of beach erosion already in progress, we have re-examined the record. Under the circumstances, in the interest of fairness, the defendants are entitled to have the district court rule in the first instance on the "purpose" issue and enter findings thereon. We, therefore, vacate the statement in our previous opinion that "the purpose of the wall was to improve defendants' property, not to protect it from the 'common enemy,' the sea," and leave this issue for the district court. Whether on the present record or on additional evidence is for that court to say.

With the issue of purpose decided, the case—as we see it—will present these issues under Florida law: A littoral landowner erects a seawall on the MHWM or landward thereof but in close proximity to it.[5] Is he

---

4. That finding is not clearly erroneous.
5. Subsequent to the actions of defendants upon which this suit was brought Florida enacted

Fla.Stat.Ann. § 161.052 requiring a 50 foot minimum setback for all beachfront construction.

liable to nearby property owners whose beachfront property is damaged by erosion caused or contributed to by the seawall, if a seawall was necessary to protect his own property against beach erosion? If not otherwise liable, is he liable if his purpose was entirely or partly to improve his own property (if the court finds there was such purpose)?

In its opinion after the first trial the district court stated that if a purchaser desires to acquire property by deed or long-term lease for a specific project, causes a survey to be made by a registered surveyor and acquires the property in reliance thereon, and proceeds with reasonable dispatch to erect improvements on the property, then he "has a right to rely upon his property line as established and existing by the said survey." *See* 476 F.2d at 87. We pointed out that no authority was cited in support of this proposition, except one case concerning an official government survey which under Florida law "creates" boundaries. We held:

> If the trial court's statement is construed to mean that a purchaser who acquires real property in reliance upon a private survey may, without adverse legal consequences, improve and construct within the boundaries as reflected by the survey, regardless of whether the surveyor has correctly located the boundaries, we have no hesitation in saying it is erroneous. Adjoining landowners, including the sovereign who holds land for all, may not be deprived of title or dominion over their property in that manner. (Footnote omitted.)

*Id.* On remand the district court found:

> It is the express finding of the Court that where the defendants were purchasing a piece of property by deed or by way of a long term lease, for a specific project, and the purchaser then proceeds, with reasonable dispatch, as was done in this case, to construct and erect the improvements on said property, that the purchaser or lessor (defendants herein) has a right to rely upon his property line, as established and

existing by the said survey of M. E. Berry of September 12, 1967 at the time of the negotiations, or certainly when the negotiations were imminent and then concluded. In the instant case, the entire period involved was actually less than one year.

This helps us little if any more than the district court's statement in its first opinion. On this appeal the defendants recognize that the holding cannot mean what it literally says, *i. e.*, that under the circumstances stated by the court and quoted just above the landowner acquires absolute immunity from the consequences of his construction of improvements done in reliance on the property lines shown on the survey. Rather, they urge a narrowed construction, limited to the "unique circumstances of this case" and to a changeable MHWM which "varies as the forces of the ocean are brought to bear upon it." Even that narrowed construction is dubious. Possibly a landowner would be non-negligent if, in the circumstances described by the district judge, he constructed improvements in reliance upon the survey's location of property lines that are fixed in nature. But that would not necessarily be so where the line relied upon is not fixed but changeable. Some of the factors deserving consideration would be whether the landowner builds on, or very close to, the location shown for a changeable line; whether it is the practice of surveyors in the community to fix with precision the present location of the MHWM; and whether in this instance the surveyor knew that an exact location for the MHWM was necessary. Berry testified that the owner asked for a boundary survey on the property and that "In the normal course of doing a survey on a navigable body of land [sic], we show the mean high water line." Harrison testified that he received no special instructions but was told just to make a survey. After describing the manner in which he established the line by visual observation, he testified as follows:

> Q. Is that a scientific way of doing it? Are there other ways of doing it?

**990**

Q. ... 

A. Yes. There is another way to do it.

Q. What is the other way to do it?

A. By establishing an elevation.

Q. Now, did you do that?

A. No, I didn't.

Another witness, Reeves, who made another survey, testified that normally his surveying firm would not use the visual observation method to establish the mean high water mark but would "arrive at it by means of an elevation."

Also, the above-quoted finding seems to us to overlook the possibility that the landowner might be liable on theories other than negligence. Without deciding or intimating a view by us, *see* Restatement (Second) of Torts, § 364 (1965); 1 Fla.Jur. *Adjoining Landowners* § 3; 1 Am.Jur.2d *Adjoining Landowners* § 30.

The above-quoted finding must be vacated, and on remand the district court can reconsider the matter of the landowner's right to rely upon a survey vis-a-vis his obligations to other landowners.

VACATED in part, REVERSED in part, and REMANDED to the district court for further proceedings not inconsistent with this opinion.