# IN THE UNITED STATES COURT OF APPEALS

# FOR THE FIFTH CIRCUIT

_____

m 99-30354

_____

SNYDER OIL CORPORATION,

Plaintiff-Appellant,

VERSUS

SAMEDAN OIL CORPORATION,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Western District of Louisiana

_____

April 13, 2000

Before DAVIS, CYNTHIA HOLCOMB HALL,[*] and SMITH, Circuit Judges.

JERRY E. SMITH, Circuit Judge:

Snyder Oil Corporation ("Snyder") appeals an order granting transfer to the Southern District of Alabama pursuant to 28 U.S.C. § 1404(a). We affirm.

I.

Snyder[1] and Samedan Oil Corporation ("Samedan") entered into a joint operating agreement ("JOA") for the development of a federal oil and gas lease granted by the United States Department of Interior Minerals Management Service ("MMS"). The lease covered "Block 261, Main Pass Area, South and East Addition," which is located on the Outer Continental Shelf ("OCS"). The

_____

[*] Circuit Judge of the Ninth Circuit, sitting by designation.

[1] Snyder is the parent corporation of SOCO Offshore, Inc., and was substituted as the plaintiff.

property is commonly referred to as "Main Pass 261" or "Block 261."

Snyder sued in the Western District of Louisiana, seeking a declaratory judgment regarding the rights of the parties under the JOA. Samedan subsequently sued, asserting claims in the Southern District of Alabama, then moved to dismiss or transfer the Louisiana suit. The court denied the motion to dismiss but transferred pursuant to 28 U.S.C. § 1404(a), based on a finding that Alabama law will govern and that Alabama therefore has the most interest in the outcome of the litigation. The court then certified an interlocutory appeal under 28 U.S.C. § 1292(b), and we granted leave to appeal.

The order of transfer was based on a choice of law determination, and because Block 261 is located in federal waters on the OCS, the controlling law is found in the Outer Continental Shelf Lands Act ("OCSLA"), 43 U.S.C. §§ 1331-1356, which vests the United States with jurisdiction over the soil and seabed of the oceans and artificial islands and fixed structures located thereon, and grants to the United States the mineral resources that are part of the OCS. Section 1333(a)(2)(A) of that Act provides:

> To the extent that they are applicable . . . the civil and criminal laws of each adjacent State . . . are hereby declared to be the law of the United States for that portion of the subsoil and seabed of the outer Continental Shelf, and artificial islands and fixed structures erected thereon, which would be within the area of the State if its boundaries were extended seaward to the outer margin of the outer Continental Shelf, and the President shall determine and publish in

the Federal Register such projected lines extending seaward and defining each such area.

This Congressionally mandated choice of law provision trumps any contrary contractual provisions. *See Union Tex. Petroleum Corp. v. PLT Eng'g, Inc.*, 895 F.2d 1043, 1050 (5th Cir. 1990).

The parties agree that § 1333(a)(2)(A) is controlling, but Snyder contests the court's application of that section. Because the President has not published the "projected lines" required by § 1333(a)(2)(A), the courts must adjudicate adjacency in private disputes governed by OCSLA. We conducted the required "adjacency determination" in *Reeves v. B & S Welding, Inc.*, 897 F.2d 178 (5th Cir. 1990), and the district court and both parties recognize *Reeves* as the controlling precedent.

The issue is whether the district court's application of *Reeves* is correct as a matter of law. The court found Block 261 to be "adjacent" to Alabama for purposes of § 1333(a)(2)(A) and therefore held that Alabama law governs the dispute.

II.

In *Reeves*, we held that a platform located in the High Island Field in the Gulf of Mexico was "adjacent" to Texas within the meaning of § 1333(a)(2)(A). We considered, *inter alia*, the following evidence:

> Testimony and exhibits before the district court showed that [the subject platform] is closer to the Texas coast than to the Louisiana coast. Charts submitted by Exxon also indicated that the High Island Field is considered to be "adjacent" to Texas, rather than

2

Louisiana, by the United States Department of Interior Bureau of Land Management, the United States Department of Interior Mineral Management Service, the National Oceanic & Atmospheric Administration, and the Coast Guard.

*Reeves*, 897 F.2d at 179.

We also considered that other courts had construed platforms located in the High Island Field to be adjacent to Texas under OCSLA, specifically citing two Louisiana district court opinions. *See id*. at 179-80. Lastly, we discussed four proposed "boundary projections," two of which would locate the platform in Texas waters and two of which would locate it in Louisiana waters. *See id*. at 180. In other words, if these lines were promulgated by the President pursuant to OCSLA, two of them would result in the platform's being "adjacent" to Texas, and two would result in its being "adjacent" to Louisiana.

We rejected the appellant's projected lines as unsupported but considered both of the appellee's projected lines to be plausible, the latter two being "fully consistent with the existing Texas/Louisiana boundary established by the Supreme Court." *Id*. We therefore determined that "[f]or purposes of this case, we need not decide which of appellees [*sic*] proposed boundaries is the proper one," because under either boundary projection the platform was "adjacent" to Texas. *Id*.

In considering these projected lines, we noted that

[i]t would not be proper in this case to adjudicate the boundary itself. That

would call for more thorough production of evidence and consideration by the court. It is also a matter of significant concern to the two states themselves, and they should be heard if that issue were to be litigated.

*Id*. Therefore, while *Reeves* instructs that proposed boundary projections are relevant to a private dispute, it would be improper for a court to hold that a given boundary projection was conclusively established for purposes of § 1333(a)(2)(A).

*Reeves* concludes as follows:

It is enough that the record evidence before the district court confirms that [the subject platform] is closer to the Texas coast than the Louisiana coast, that the relevant federal agencies consider [the subject platform] to be off the Texas coast, that other courts have considered other High Island platforms to be adjacent to Texas, and that the boundary between Texas and Louisiana projected out into the Gulf in its original direction from the shore, places [the subject platform] within Texas waters. So also does a line projected directly southward from the Texas three league territorial boundary. We conclude, therefore, that the district court did not err in holding that [the subject platform] is "adjacent" to Texas for purposes of the OCSLA.

*Id*. While we did not articulate a specific test, we therefore considered four types of evidence in the "adjacency" analysis: (1) geographic proximity; (2) which coast federal agencies consider the subject platform to be "off of"; (3) prior court determinations; and (4) projected boundaries.

### III.

The President has failed to publish the boundary projections required by OCSLA, and the responsible federal agency, the MMS, refused the parties' request to make an adjacency determination. Therefore, the district court applied the multi-factored *Reeves* analysis.

While both parties recognize *Reeves* as controlling, Snyder requests that we "clarify" *Reeves* to hold that in the absence of an express determination of "adjacency" pursuant to § 1333(a)(2)(A) by an authorized federal agency, geographic proximity is determinative.[2] To label this request a "clarification," Snyder cites a related section of OCSLA and a district court case stressing proximity, rejects as irrelevant all federal agency determinations not specific to this statutory section, claims *Reeves*'s consideration of other court opinions was merely a recitation of comity and *stare decisis*, and urges that all discussion of projected boundaries in *Reeves* was needless *dictum*. An analysis of these assertions demonstrates the errors in Snyder's contentions.

Snyder cites *Pittencrieff Resources, Inc. v. Firstland Offshore Exploration Co.*, 942 F. Supp. 271 (E.D. La. 1996), for the proposition that geographic proximity is determinative. *Pittencrieff* held that the subject property was "adjacent" to Alabama for purposes of OCSLA because it was nearer to the Alabama coast than to the Louisiana coast.

As an initial matter, a district court's

interpretation of *Reeves* would not alter that holding. Further, *Pittencrieff* determined "adjacency" on the sole ground of geographic proximity, because "[n]o party to this action has disputed that Alabama is the closest state geographically, and no party has provided any reason why Louisiana or Florida should be considered the adjacent state." *Id*. at 277. This is entirely consistent with the *Reeves* multi-factored analysis; if the parties present evidence on only one factor, that factor is controlling.

Snyder also cites 43 U.S.C. § 1333(c), which states that

> [f]or the purposes of the National Labor Relations Act . . . any unfair labor practice . . . occurring upon any artificial island . . . referred to in [§ 1333(a)] shall be deemed to have occurred within the judicial district of the State, the laws of which apply to such artificial island . . . pursuant to [§ 1333(a)], except that until the President determines the areas within which such State laws are applicable, the judicial district shall be that of the State nearest the place of location of such artificial island.

If proximity were controlling for purposes of § 1333(a)(2)(A) as a statutory matter because of inclusion of § 1333(c), we would not have considered other evidence in *Reeves*: That other evidence would have been irrelevant, regardless of whether it was consistent or inconsistent with this "controlling" factor. *Reeves* rejects Snyder's proposed interpretation. The presence of § 1333(c) demonstrates that Congress was aware of the desirability of "default" provisions pending Presidential action, but it chose not to provide such provisions for § 1333(a)(2)(A).

---

[2] The Block 261 platform is approximately six miles closer to Louisiana than to Alabama.

Snyder eschews as irrelevant all state and federal agency actions other than a federal agency's "actual, express determination of adjacency for purposes of the OCSLA." The *Reeves* court considered charts indicating that the following federal agencies considered the subject platform to be off the Texas coast: the Department of Interior Bureau of Land Management, MMS, the National Oceanic and Atmospheric Administration ("NOAA"), and the Coast Guard.

The parties agree that MMS would have authority to issue official projections under § 1333(a)(2)(A). If it did so, the determination of adjacency would be a relatively simple matter of application not requiring the *Reeves* approach. Until such official projections are published, however, some agency's determination "pursuant" to that section is no more relevant than an agency's adjacency determination for some other purpose. The former may be more probative if it is believed that the agency more closely followed the dictates of § 1333(a)(2)(A), but it is not "more relevant."

Rule 401, FED. R. EVID., defines "relevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Agency determinations of projected boundaries, or other determinations of a similar nature, make it more probable that if the President does ever "project boundaries" those boundaries will be consistent with these other agency determinations. For example, if all federal agencies have, for various reasons, determined that a platform is off the coast of Texas, it is more probable that the President will project a boundary such that the platform is "adjacent"

to Texas.

As long as the President fails to perform and publish the § 1333(a)(2)(A) calculations, we must follow *Reeves* in considering all relevant evidence. *Reeves* did not establish a strict four-factor test, but instead considered all four categories of relevant evidence before the court. *Pittencrieff* correctly followed *Reeves* by considering the one piece of relevant evidence before it, and the district court correctly considered all relevant evidence in making its determination. We cannot apply the formalistic test desired by Snyder, for neither logic nor authority allows this court arbitrarily to disregard all relevant evidence except that of geographic proximity.[3]

IV.

Having rejected Snyder's interpretation of *Reeves*, we must consider whether the district court considered categories of evidence that are legally irrelevant to a § 1333(a)(2)(A) "adjacency" determination. In its "Reasons for Judgment," the district court found that references to Alabama in certain Snyder contracts "sp[oke] volumes as to the intent of [Snyder] and their [sic] original acknowledgment of the location of Block 261." Because § 1333(a)(2)(A) is a mandatory choice of law provision, intent is irrelevant. *See Union Texas*, 895 F.2d at 1043. Although consideration of such intent would therefore constitute error, the court's statement, read in context, makes plain either that the court either knew not to consider such

---

[3] Snyder argues that this court should apply a "geographic proximity" test, because its easily discernible nature would save time and money. While judicial economy is a concern, it does not give us free reign arbitrarily to elevate one bit of relevant evidence to a determinative position.

intent in making its legal determination or that at least such consideration did not affect that determination:

> After considering [federal agency determinations] along with the other *Reeves* factors this court is persuaded that Main Pass 261 is located offshore Alabama, and, therefore, this matter should be transferred. *It should also be noted that* in other contracts between [Snyder] and other parties, [Snyder] refers to Main Pass 261 and Block 261 as being located "offshore Alabama."

(Emphasis added.) Therefore, contrary to Snyder's assertion, the court did not improperly consider "intent" evidence.

Samedan submitted charts, maps, notices, and reports published by the MMS, the Bureau of Land Management, NOAA, and the Coast Guard, supporting the conclusion that Block 261 is considered to be off the coast of Alabama.[4] Samedan also presented evidence that the Louisiana State Lands Office does not consider Block 261 to be off the coast of Louisiana, but that Alabama state agencies do consider it to be off Alabama. Lastly, Samedan presented evidence that if the Mississippi-Alabama border is extended seaward from the three mile line through the OCS, either due south or in the natural southeasterly direction of the common boundary (the two projections favorably considered in *Reeves*), Block 261 lies eastward of the extension and hence is in Alabama waters.[5]

### A.

The documentary evidence introduced by Samedan demonstrates that several federal government agencies, for purposes other than OCSLA, have considered Block 261 to be off the coast of Alabama. For example, an MMS chart and diagram illustrates the Mississippi-Alabama boundary and the MMS extension of that boundary seaward into federal waters. Snyder does not dispute that a continuation of that line places Block 261 in Alabama waters. Likewise, an MMS notice to lessees articulates that activities in the Block 261 area affect only Alabama.

Also introduced was an NOAA report containing the NOAA's extension of boundaries for a now-defunct federal program; it is undisputed that the Louisiana-Mississippi boundary so extended is significantly west of Block 261.[6] A chart demonstrated that Block 261 falls within the jurisdiction of the Alabama district of the Coast Guard Captain of the Port Zone,[7] and a U.S. Geological Survey report refers to the area of Block 261 as the "Mississippi-Alabama" OCS.

---

[4] The phrase "off the coast of" avoids use of the term "adjacent," as the agency determinations at issue are *not* adjacency determinations pursuant to § 1333(a)(2)(A).

[5] As in *Reeves*, considering this last piece of evidence is *not* adjudicating the Mississippi-Alabama border. It merely recognizes the probative value of the fact that either proposed extension, if used by the President, would place the platform "adjacent" to Alabama.

[6] Snyder, while contesting its relevance, did argue that a straight-line extension of the Louisiana-Mississippi boundary would instead run north of Block 261.

[7] In particular, it falls within the Mobile, Alabama, District instead of the New Orleans, Louisiana, District.

Citing *Rhoads v. Virginia-Florida Corp.*, 476 F.2d 82 (5th Cir. 1973), Snyder argues that this documentary evidence is irrelevant without testimony as to what the documents were intended to convey. *Rhoads* held that private surveyor drawings that had not been verified by testimony were not admissible for testimonial use. We stated that

> [b]efore the documents could be admitted for "testimonial use," that is, where the documents themselves would "testify" as direct evidence on a material disputed issue of fact, they were required to be verified. "[W]henever such a document is offered as proving a thing to be as therein represented, then it is offered testimonially, and it must be associated with a testifier." 3 Wigmore, On Evidence, § 790, at 218 (Chadbourn ed. 1970). Verification required at the minimum a showing by the testimony of some competent witness that the lines of the drawings were correct representations of the actual physical characteristics of the land and objects which they purported to show.

*Rhoads*, 476 F.2d at 85.

Although Samedan does not distinguish its proffers from those in *Rhoads*, they are distinguishable.[8]    When considering

admissibility, the initial step is always to determine the purpose for which the documents are being offered. *See* 22 CHARLES A. WRIGHT & KENNETH W. GRAHAM, JR., FEDERAL PRACTICE AND PROCEDURE § 5164, at 38 (1978). *Rhoads* notes that in Florida a private survey could be used as direct evidence, but only if it was shown to be "a resurvey tieing into or based on lines, calls and measurements previously established by the official U.S. government survey, if there is one, and if not, the oldest private survey under which property rights in the area were originally acquired." *Rhoads*, 476 F.2d at 85 n.5. We observed that without testimony, "[t]here [was] no evidence that lines, calls and monuments portrayed on the drawings were based on or tied in to [*sic*], or derived from, an official survey or the oldest private survey." *Id.* at 85.

Taken in context, the quotation by Wigmore relied on in *Rhoads* is as follows:

> It may, sometimes, to be sure, not be offered as a source of evidence, but only as a document whose existence and tenor are material in the substantive law applicable to the case, as where . . . in ejectment for land conveyed by deed containing a map, the map is to be used irrespective of the correctness of the drawing; here we do not believe anything because the map represents it. But whenever such a document is offered as proving *a thing to be as therein represented*, then it is offered testimonially, and it *must be associated with a testifier*.

[8] Instead, Samedan relies on the inference that Reeves considered similar evidence without testimony, supported by the fact that *Reeves* notes "[t]estimony and exhibits" concerning geographic proximity but only "[c]harts" concerning federal agency determinations. *See Reeves*, 897 F.2d at 179. Because relevancy objections can be waived, however, we must review the admissibility (continued...)

[8](...continued) of such documents.

7

WIGMORE ON EVIDENCE § 790, at 218 (Chadbourn ed. 1970). The documentary evidence presented by Samedan is admissible for reasons akin to the ejectment example given by Wigmore. The district court did not use the evidence of agency determinations because it believed that information to be "correct," whatever that would mean where an infinite number of boundary projections are possible. Instead, the court considered the evidence because irrespective of whether it is "correct" in some abstract sense, the fact that the agencies consider the location to be off the coast of Alabama makes it more probable that the President will "project" a boundary that agrees with this result.

The admissibility of the documentary evidence is further supported by Wigmore's treatment of official reports. Wigmore favorably recommends the Uniform Official Reports as Evidence Act (1936), which provides as follows:

> Written reports or findings of fact made by officers of this State on a matter within the scope of their duty as defined by statute shall, in so far as relevant, be admitted as evidence of the matters stated therein. . . . Any adverse party may cross-examine any person making such reports or findings or any person furnishing information used therein; but the fact that such testimony may not be obtainable shall not affect the admissibility of the report or finding, unless, in the opinion of the Court, the adverse party is unfairly prejudiced thereby.

WIGMORE, *supra*, § 1673 at 822.

Therefore, because official reports are inherently more reliable than are private reports,

and, more importantly, because the reports are relevant irrespective of whether they are "correct," the court properly considered the documentary evidence.

## B.

Snyder contends that Samedan's affidavit and deposition testimony are irrelevant.[9] Mr. Mayeux, a registered land surveyor in five states, examined the agency maps and charts submitted by Samedan. He confirmed the location of Block 261 thereon and concluded that an extension of the Mississippi-Alabama boundary, whether due south or in its natural southeasterly direction, results in Block 261's falling on the Alabama side of the extension. Mr. St. Romain, Administrator of the Louisiana State Lands Office, stated that Block 261 is not "considered by the Louisiana State Land Office to be located in waters adjacent to the State of Louisiana." Mr. Gane, Chief of Coastal Programs for the Alabama Department of Environmental Management, stated that that agency considers Block 261 to be subject to its management. Mr. Griggs, director of the Alabama Department of Conservation and Natural Resources, Land Division, stated that the Land Division considers Block 261 to be located adjacent to Alabama. Mr. Easterly, who represented Louisiana in the development of the NOAA report proffered by Samedan, stated that the

---

[9] Snyder also objected based on hearsay, lack of personal knowledge, and lack of expertise. These specific evidentiary determinations are not at issue in this interlocutory appeal, in which Snyder argues that certain categories of evidence are inadmissible as a matter of law. Furthermore, Snyder fails even to articulate, let alone establish, the legal standard that the court abused its discretion on any of these other grounds. *See General Elec. Co. v. Joiner*, 522 U.S. 136 (1997); *Curtis v. M&S Petroleum, Inc.*, 174 F.3d 661, 667 (5th Cir. 1999).

8

program defined adjacency by using an extended lateral seaward boundary of the state.

These categories of evidence are admissible.  Experts may examine and discuss federal agency reports.  While not considered by the court in *Reeves*, there is likewise no reason to deem irrelevant the opinions of affected state agenciesSSthey may be less probative than are opinions of federal agencies, but they are not irrelevant.  In the absence of Presidential action pursuant to § 1333(a)(2)(A), it is relevant what affected federal and state agencies have determined, regardless of whether their determinations are "correct" in some abstract sense.

AFFIRMED.