PITTENCRIEFF RESOURCES, INC.
Successor in Interest to Aberdeen
Petroleum (USA) Inc.

v.

FIRSTLAND OFFSHORE EXPLORA-
TION COMPANY, Union Oil Company
of California, Continental Land & Fur
Co., Inc., Denny Offshore Exploration
Company, Walker Exploration Compa-
ny, Princeton Energy Group II Ltd.,
Wheatley Natural Gas, Inc., and Day
Exploration, Inc.

Civil Action No. 95–3495.

United States District Court,
E.D. Louisiana.

Oct. 15, 1996.

Robert Stephen Rooth, Chaffe, McCall, Phillips, Toler & Sarpy, New Orleans, LA, James H. Baumgartner, Jr., Larry J. Bridgefarmer, Vial, Hamilton, Koch & Knox, Dallas, TX, for Pittencrieff Resources Inc.

Winston Edward Rice, Samuel A. Giberga, Rice & Fowler, New Orleans, LA, for Firstland Offshore Exploration Co.

Patrick Wise Gray, Liskow & Lewis, Lafayette, LA, for Union Oil Company of California.

M. Taylor Darden, David Lyman Browne, Carver, Darden, Koretzky, Tessier, Finn, Blossman & Areaux, LLC, New Orleans, LA, for Continental Land & Fur Co., Inc.

Glenn Gates Taylor, C. Dale Shearer, Copeland, Cook, Taylor & Bush, Jackson, MS, for Denny Offshore Exploration, Inc. and Day Exploration Inc.

Jefferson D. Stewart, Brunini, Grantham, Grower & Hewes, Jackson, MS, for Walker Exploration Co.

### ORDER AND REASONS

VANCE, District Judge.

This matter is before the Court on a motion for summary judgment by plaintiff Pittencrieff Resources, Inc., successor-in-interest to Aberdeen Petroleum (USA) Inc. ("Pittencrieff"). For the reasons stated below, the motion is GRANTED in part and DENIED in part.

### I. BACKGROUND

This is an action for declaratory relief brought pursuant to 28 U.S.C. § 2201, et seq., concerning the proposed plugging and abandonment of two nonproducing offshore gas wells and the proposed abandonment of an offshore drilling and production platform located in Main Pass Blocks 253 and 254 ("Main Pass 253/254"). The parties to the suit are all either direct parties or successors-in-interest of direct parties to an Offshore Operating Agreement (the "JOA") covering two oil and gas leases ("the Leases") located in the Gulf of Mexico off the coasts of Alabama, Louisiana, and Florida, which were awarded by the United States Department of the Interior, through the Minerals Management Service ("MMS"), to Chevron USA, Inc. ("Chevron") in April 1982.

Successful exploratory drilling by Chevron and Shell on leases in Main Pass 253/254 led to the installation of a Chevron platform in 1975. In 1978, the leases were abandoned after developmental drilling proved unsatisfactory, although the platform was not removed. In 1982, Chevron re-leased the area, and gas was subsequently discovered in the surrounding area. On March 2, 1987, Chevron assigned its interest in the Leases to Hughes–Denny Offshore Exploration, Inc. ("Hughes–Denny"), who agreed to assume all of Chevron's obligations and liabilities with respect to the Leases, including the continuation of drilling and development operations in accordance with the terms of Chevron's Schedules of Activity, which had been approved by the MMS. In return for Hughes–Denny's assumption of these obligations and liabilities, Chevron agreed, subject to certain express conditions, to pay Hughes–Denny the sum of $1,500,000 upon proper abandonment of the wells, facilities, and platforms located on the Leases (the "Chevron contribution"). *See* Complaint ¶¶ 12, 13; Firstland answer ¶¶ 12, 13; Unocal answer ¶¶ 12, 13; Continental answer ¶¶ 12, 13; Day and DOE answer ¶¶ 12, 13; Walker answer ¶¶ 12, 13; and by default Princeton and Wheatley. The Chevron contribution is presently scheduled to expire on January 27, 1997.

Shortly after Chevron assigned its interest in the Leases to Hughes–Denny, the JOA was entered into on July 27, 1987.[1] The JOA

---

1. The parties to the JOA are Hughes–Denny Off- shore Exploration, Inc., Dudley Hughes Offshore,

contains express provisions governing proposals to plug and abandon a platform and/or a well. Specifically, the agreement provides, in relevant part:

8.26 At the request of any party owning an interest in a platform, Operator shall furnish to the owners thereof the estimated net deficit or net value resulting from the salvage and removal of the platform.... [W]ithin thirty (30) days after the of such estimate, any party owning an interest in a platform may propose to the other owners thereof that it be salvaged and removed from the lease, at the same time agreeing to convey its interest therein to any owner thereof desiring to retain the platform and to pay to or accept from such other owners such proposing party's share of such estimated net deficit or net value, as the case may be. Any such other owner may, within thirty (30) days after receipt of such a proposal, elect to retain the platform by giving notice thereof to the other owners, at the same time agreeing to accept its pro rata share of the interest of any parties desiring salvage and removal and to make or accept payment for the estimated net value or net deficit attributable to such interest as hereinabove provided. The parties will properly thereafter make such payments and execute a conveyance, as of the date of the earliest notice given by a party desiring to retain the platform, of the interest of the parties desiring to salvage and opinion to the parties desiring to retain such platform.... If no party desires to retain the platform, Operator shall proceed promptly to have same salvaged and removed at the cost of the owners thereof.

9.1 .... [N]o well on the Joint Property which is producing or has once produced shall be abandoned without the consent of all the parties then owning an interest therein. The parties last sharing in the production shall bear the cost and risk of abandonment. If the par-

ties are unable to agree as to the abandonment, the party or parties desiring to abandon shall notify the other party or parties to that effect, and the party or parties desiring that the well be retained, within thirty (30) days after receipt of such notice shall pay to the party or parties desiring abandonment the proportionate share of such latter party or parties' interest in the salvage value of the material and equipment in on said well (less the proportionate part of such receiving party or parties' share of the estimated cost of plugging and abandoning), such value to be determined in accordance with the Accounting Procedure set forth in Exhibit "B" attached hereto. If such estimated plugging and abandonment cost exceeds such value, the party or parties desiring to abandon shall pay their proportionate part of the amount of such excess to the party or parties desiring to retain the well. (Emphasis added)

The agreement also contains express provisions governing the effect of a party defaulting under the agreement. Specifically, the agreement provides in relevant part that:

23.2 In the event any Non–Operator should fail to pay its share of the charges, costs and expenses incurred under this Agreement within forty-five (45) days after actual receipt of a statement of same for any month, such Non–Operator shall be deemed delinquent. If after fifteen (15) days following actual receipt of notice of delinquency by the Non–Operator (or by an officer of the Non–Operator if it is a Corporation), Operator has not received payment, or the Non–Operator has not made other arrangements for payment satisfactory to Operator, the delinquent Non–Operator shall be deemed to be in default and Operator, without prejudice to other existing remedies, is authorized, at its election, to collect from the purchaser or purchasers of oil and gas, the proceeds accru-

Inc., Princeton Energy Group, II ("Princeton"), Aberdeen American Petroleum Company, Inc. (now "Pittencrieff"), Wheatley Natural Gas, Inc. ("Wheatley"), Continental Land & Fur, Inc. ("Continental"), Day Oil, Ltd. (now Day Exploration, Inc. or "Day"), and Walker Exploration Company ("Walker"). Denny Offshore Explora-

tion, Inc. ("DOE") is a successor in interest to a portion of Hughes–Denny's original interest. See Complaint ¶¶ 12, 15; Firstland answer ¶¶ 12, 15; Unocal answer ¶¶ 12, 15; Continental answer ¶¶ 12, 15; Day and DOE answer ¶¶ 12, 15 Walker answer ¶¶ 12, 15 and by default Princeton and Wheatley.

ing to the working interest or interests in The Joint Property of the delinquent Non–Operator free and clear of any burdens thereon. . . .

23.4 Any party in default shall, until such time as such party's payments are current, have no further access to the maps, records, data, interpretations or other information obtained in connection with the operations under this Agreement, shall be a "non-participant" in all operations and shall not be entitled to vote on any matter. In the event of such default, the Percentage Interest of the party in default shall not be considered in the votes of the parties and, therefore, the minimum Voting Interest to carry any proposal hereunder shall be decreased to a percentage amount equal to the current minimum Voting Interest times the total of the percentage interest in The Joint Property of all parties other than the party in default. Furthermore, such party shall not be entitled to receive any notice of meetings or decisions of the parties.

In February 1994, in conformity with the requirements of Sections 8.26, and 9.1 of the JOA, Unocal, the operator at that time, sent all of the non-operators a written proposal to plug and abandon the wells and abandon the platform. *See* Complaint ¶ 18; Firstland answer ¶ 18; Unocal answer ¶ 18; Continental answer ¶ 18; Day and DOE answer ¶ 18; Walker answer ¶ 18; and by default Princeton and Wheatley. Three of the non-operator owners [2] subsequently agreed to Unocal's proposal. Three of the other non-operator owners [3] rejected the proposal. No payments or assignments were made by the operator and the non-operator owners who wanted to plug and abandon the wells and the platform to the non-operator owners who rejected the proposal. On June 10, 1994, Unocal notified the non-operators in writing that it was withdrawing its plug and abandonment proposal and that it planned to sell its interest under the JOA to a third party. There is presently no plug and abandonment

proposal pending between the operator and the nonoperators.

The present suit has divided the parties to the JOA into two warring camps: those who support Unocal's former plug and abandonment proposal and those who oppose it.[4] The supporters claim that all of the nonoperators to the agreement are in default of the JOA because they have failed to pay Unocal sums owed in connection with the exploration, development and operation of the Leases. For this reason, they argue that none of the defaulting parties should be able to vote on any proposal to plug and abandon pursuant to Section 23.4 of the JOA. Those opposed to Unocal's plug and abandonment proposal claim that at least some of the nonoperators are not in default of the JOA, and that even if they were, the JOA would not take away their right to vote on proposals to plug and abandon jointly owned properties. Pittencrieff, one of the nonoperators who supports plugging and abandonment, has moved for summary judgment and requested a declaratory judgment that "Pittencrieff and all Defendants, except Unocal, are in default of the JOA and are not entitled to vote on any matter and that Unocal therefore has the absolute right to plug and abandon the wells and the Leases without any consent by the other parties to the JOA as a result of those parties' defaults under the JOA." Record Doc. No. 25, at 2; *see also* Complaint ¶ 22. The Court will resolve the issue of the meaning of the JOA, but for the reasons stated below, it cannot grant Pittencrieff the full relief that it seeks.

## II. *LEGAL ANALYSIS*

### A. Standard of Review

 Under Fed.R.Civ.P. 56, summary judgment is proper when there is no genuine issue of material fact, and the moving party is entitled to a judgment as a matter of law. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). All inferences will be made in favor

---

2. Pittencrieff, Continental, and Walker.

3. Firstland, Day, and DOE.

4. Thus, the Court notes that while Unocal, Continental, and Walker are named defendants in this suit, each of their interests is essentially aligned with Pittencrieff's for purposes of this motion.

of the party opposing summary judgment. However, the opposing party may not rely on mere allegations or denials but must set forth specific facts establishing that genuine issues exist for trial. See Fed.R.Civ.P. 56(e). Only factual disputes "that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

### B. Justiciability

Day, DOE, and Firstland argue that because Unocal withdrew its plug and abandonment proposal, and there is no current proposal pending, there is no justiciable controversy for this Court to decide. The Court disagrees.

The Declaratory Judgment Act, 28 U.S.C. § 2201, provides in pertinent part:

> In a case of actual controversy within its jurisdiction ... any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. 28 U.S.C. § 2201.

In addressing the Act's restriction to cases of "actual controversy," the Supreme Court has noted that the case or controversy requirement under Article III of the United States Constitution is the same as the actual controversy requirement under the Act. *Aetna Life Insurance Company v. Haworth*, 300 U.S. 227, 239, 57 S.Ct. 461, 463, 81 L.Ed. 617 (1937). In providing further clarification, the Court has further stated that:

> A 'controversy' in this sense must be one that is appropriate for judicial determination. A justiciable controversy is thus distinguished from a difference or dispute of a hypothetical or abstract character; from one that is academic or moot. The controversy must be definite and concrete, touching the legal relations of parties having adverse legal interests. It must be a real and substantial controversy admitting of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be

upon a hypothetical state of facts. *Aetna Life*, 300 U.S. 227, 240–41, 57 S.Ct. 461, 464, 81 L.Ed. 617 (1937) (citations omitted); *see also* 10A C. Wright, A. Miller & M. Kane, Federal Practice and Procedure Income § 2757 at 578–620 (1983).

Recognizing the difficulty in fashioning a precise test for determining whether a request for declaratory relief has become moot, the Supreme Court has held that "the question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issue of a declaratory judgment." *Maryland Casualty Company v. Pacific Coal & Oil Company*, 312 U.S. 270, 273, 61 S.Ct. 510, 512, 85 L.Ed. 826 (1941). Guided by these teachings of the Supreme Court, the Fifth Circuit has applied the following test when determining whether a request for declaratory judgment relief presents an actual controversy:

> A controversy, to be justiciable, must be such that it can presently be litigated and decided and not hypothetical, conjectural, conditional or based upon the possibility of a factual situation that may never develop. *Rowan Companies, Inc. v. Griffin*, 876 F.2d 26, 28 (5th Cir.1989) (quoting *Brown & Root, Inc. v. Big Rock Corporation*, 383 F.2d 662, 665 (5th Cir.1967)).

Here the Court is asked to determine whether the nonoperator parties—Pittencrieff and all of the defendants except Unocal—are presently in default of the JOA and whether Unocal therefore has the absolute right to plug and abandon the wells and the Leases without any consent by the other parties to the JOA. While there is no current proposal to plug and abandon the wells, there is clearly an actual controversy among the parties as to their current rights under the JOA. This is not a hypothetical, or conjectural dispute based upon a factual dispute which may never develop. Even if there never is a proposal to plug and abandon, it is clear that the parties to this action are completely unable to agree about the rights each party presently has under the

JOA. This type of actual and live controversy is exactly what Congress had in mind in passing the Declaratory Judgment Act. *See e.g., Rowan,* 876 F.2d at 28 ("[t]he declaratory judgment vehicle ... is intended to provide a means of settling an actual controversy *before* it ripens into a ... breach of a contractual duty.") (citing *Scott–Burr Stores Corporation v. Wilcox,* 194 F.2d 989, 990 (5th Cir.1952)) (emphasis added). Thus, this Court has subject matter jurisdiction over this case.

### C. Choice of Law

■ Pittencrieff and those who support Unocal's plug and abandonment proposal assume that Louisiana law governs this case and cite to this Court Louisiana authority to support their positions. Day, DOE, and Firstland, however, argue that Alabama law most likely applies under the terms of the JOA. The Court agrees that Alabama law applies.

The choice of laws provision in the JOA provides as follows:

> **25.1** In the event of disagreement between any of the parties as to the intent and interpretation hereof, this Agreement shall be subject to and interpreted in accordance with the general maritime law or in accordance with the laws, rules and regulations of the state adjacent to The Joint Property, whichever is applicable.

■ The Court notes, however, that the Outer Continental Shelf Lands Act (OCSLA), 43 U.S.C. §§ 1333(a)(2)(A), which applies to the JOA because the Lease in question governs land that is included on the outer Continental Shelf,[5] has been found by the Fifth Circuit to be "a Congressionally mandated choice of law provision requiring that the law of the adjacent state is to apply even in the

presence of a choice of law provision in the contract to the contrary." *Union Texas Petroleum Corporation v. PLT Engineering, Inc.,* 895 F.2d 1043, 1050 (5th Cir.1990); *see also Wooton v. Pumpkin Air, Inc.,* 869 F.2d 848, 852 (5th Cir.1989); *Matte v. Zapata Offshore Co.,* 784 F.2d 628, 631 (5th Cir.), *cert. denied,* 479 U.S. 872, 107 S.Ct. 247, 93 L.Ed.2d 171 (1986). In any event, it is clear that the JOA's choice of law provision is consistent with the governing federal provision; both provide that the "law of the adjacent state" applies to this case.

The Court finds that the Joint Property, Main Pass 253/254, is, for purposes of the OCSLA, "adjacent" to the coast of the State of Alabama. The record reflects that the property in question is located approximately 56 miles from Alabama, 57 miles from Florida, and 64 miles from Louisiana. *See* Record Doc. 32, Aff. Of Walter Denny at ¶ 3 and accompanying map at Exhibit 1. No party to this action has disputed that Alabama is the closest state geographically, and no party has provided any reason why Louisiana or Florida should be considered the adjacent state. Accordingly, the Court finds that the law of Alabama applies. *See Reeves v. B & S Welding, Inc.,* 897 F.2d 178, 179–80 (5th Cir. 1990) (upholding trial court decision that, for purposes of the OCSLA, Texas was the adjacent state, largely because Texas was closest state).

### D. Interpretation of the JOA

■ Alabama law provides that "[i]f the terms [of a contract] are certain and clear, the court's duty is to determine the meaning of those terms." *Johnson v. Cervera,* 508 So.2d 257, 259 (Ala.1987). Moreover, in interpreting a contract, "[t]he court

---

**5.** 43 U.S.C. § 1333(a)(2)(A) provides that:

> To the extent that they are applicable and not inconsistent with this subchapter or with other Federal laws and regulations of the Secretary now in effect or hereafter adopted, the civil and criminal laws of each adjacent State, now in effect or hereafter adopted, amended, or repealed are hereby declared to be the law of the United States for that portion of the subsoil and seabed of the outer Continental Shelf, and artificial islands and fixed structures erected thereon, which

> would be within the area of the State if its boundaries were extended seaward to the outer margin of the outer Continental Shelf, and the President shall determine and publish in the Federal Register such projected lines extending seaward and defining each such area.... 43 U.S.C. § 1333(a)(2)(A).

None of the parties to this action dispute that the Leases in question govern property that is subject to the OCSLA. It is clear, then, that 43 U.S.C. § 1333(a)(2)(A) applies to the instant case.

will give a natural meaning to the words in a contract so that all provisions of the contract are given a reasonable interpretation." *Shadrick v. Johnston*, 581 So.2d 805, 810 (Ala. 1991); *Tri–Tube, Inc. v. OEM Components, Inc.*, 672 So.2d 1303, 1306 (Ala.Civ.App.1995). Finally, contract interpretation is guided by the intent of the parties which, absent ambiguity, is evidenced by the plain language of the clause. *See Loerch v. National Bank of Commerce of Birmingham*, 624 So.2d 552, 553 (Ala.1993). "The mere fact that adverse parties contend for different constructions [of a particular contractual provision] does not of itself force the conclusion that the disputed language is ambiguous." *Cannon v. State Farm Mutual Automobile Insurance Company*, 590 So.2d 191, 194 (Ala.1991) (quoting *Upton v. Mississippi Valley Title Insurance Company*, 469 So.2d 548, 554 (Ala.1985)) (quoting *Antram v. Stuyvesant Life Insurance Company*, 291 Ala. 716, 287 So.2d 837, 840 (1973)). Rather, an ambiguity exists when a term is reasonably subject to more than one interpretation. *Id.; see generally*, Black's Law Dictionary 79–80 (6th ed. 1990).

■ The Court has studied the provisions of the JOA, and has considered the arguments of counsel. In addition, the Court requested additional briefing after oral argument on certain issues raised by Unocal at the oral argument. Having considered all of the foregoing input, as well as the above principles of contract interpretation, the Court concludes that the JOA prohibits defaulting parties from voting on proposals for abandonment of a well or platform or on any matter. Paragraph 24.3 of the JOA explicitly provides that any party in default (1) "shall have no further access to information obtained in connection with the operations under this Agreement"; (2) "shall be a non-participant in all operations"; (3) *"shall not be entitled to vote on any matter"*; and (4) "shall not be entitled to receive any notice of meetings or decisions of the parties" (emphasis added). At the oral argument, the Court expressed a concern that such a reading of this provision would cause an unintended forfeiture of the defaulting parties' interest in

the abandoned property. The Court is now convinced that denial of voting rights to defaulting parties does not necessarily result in a forfeiture when abandonment is at issue.[6] Section 24.3 does necessarily mean, however, that a defaulting party is prevented from having a say in what is done with the co-owned property. Further, if a forfeiture does result, it cannot be said that the agreement does not contemplate that defaulting parties will forfeit rights unless their default is rectified. This is apparent from the language of Section 24.3, which provides that defaulting parties "shall be non-participants in all operations," and shall not receive access to information or notice of decisions.

The agreement itself demonstrates that the parties intended Paragraph 24.3 to apply to the abandonment provisions of Paragraphs 8.26 and 9.1. Those provisions each call for certain *elections* by the parties with respect to proposals to abandon either a platform (Paragraph 8.26) or a well (Paragraph 9.1). Paragraph 8.26 clearly provides that owners wishing to retain a platform that one party has proposed to abandon "may, within thirty (30) days after receipt of such a proposal, *elect* to retain the platform" (emphasis added). Likewise, Paragraph 9.1 provides that "no well on the Joint Property which is producing or has once produced shall be abandoned without the consent of all the parties then owning an interest therein." The giving or withholding of consent is equivalent to voting on a proposal to plug and abandon a well. Since Paragraph 24.3 provides that defaulting parties cannot vote on *any* matter, the Court finds that it applies to both of these provisions of the JOA.

The Court notes that the JOA in question is not a standard form agreement. The only jurisprudence or commentary on a provision such as that of Paragraph 24.3 is an article by Archie Estess, which suggests that a similar provision might be effective to prevent a delinquent party from free-riding on his co-owners for the costs of operations. *See* Archie R. Estess, *Selected Problems in the*

---

**6.** A once producing well cannot be abandoned unless all of the owners in interest agree. Thus, simply because a defaulting party cannot vote does not necessarily mean a well can be abandoned anyway, unless no dissenter is eligible to vote.

*Preparation of Operating Agreements,* 33 Institute on Mineral Law 197, 214–15 (1986). The language of Paragraph 24.3 would accomplish a similar goal of dealing with the free rider problem by preventing defaulting parties from having access to any information, voting on any matter, or participating in any operations.

Further, there is no reason to believe that the "consent" needed under Paragraph 9.1 for a platform to be abandoned does not constitute a "vote on any matter." Webster's *Third New International Dictionary*'s primary definition of vote is "a ... formal expression of opinion or will in response to a proposed decision; *esp:* one given as an indication of approval or disapproval of a proposal...." The plain language of the contract, therefore, clearly suggests that Paragraph 24.3's prohibition on voting on any matter by parties in default applies to the right to consent or dissent to a well's being plugged and abandoned. The Court finds, therefore, that the JOA prohibits defaulting parties from voting on *any* matter, including proposals to plug and abandon a well or platform under the Agreement.

### E. Application of the JOA to the Parties

Even though the Court agrees with Pittencrieff's interpretation of the JOA, the Court finds that it cannot grant Pittencrieff's Motion for Summary Judgment in full, because a genuine issue of material fact has been raised as to whether or not the nonoperating parties to the JOA are in default. Day, DOE, and Firstland have each asserted, by affidavit, that they are not in default under the JOA, because they are entitled to certain credits and adjustments against their payment obligations to Unocal under the JOA. *See* Doc. No. 52, Exhibit B, Affidavit of Hal Bailey, Jr., ¶ 7; Exhibit C, Affidavit of Walter Denny, ¶ 8; Exhibit D, Unsworn Dec-

larations Under Penalty of Perjury of J.P. Killen, ¶ 7. Moreover, Day, DOE, and Firstland all contend that they are not in default because the JOA expressly provides that a delinquent party must be given notice of a potential default before the delinquent party can be considered in default. Specifically, Day, DOE, and Firstland point out that Paragraph 23.2 of the agreement provides that actual receipt of notice of delinquency is required before a party can be deemed to be in default.[7] Further, Day and DOE swear that they received no such notice. *See* Record Doc. no. 32, Affidavit of Walter Denny at ¶ 8; Affidavit of Hal Bailey at ¶ 7.

In light of this evidence, there can be no question that there is a genuine issue of material fact regarding whether the non-operating parties were in default of the JOA. Therefore, the Court denies Pittencrieff's request for a ruling that the non-operating parties are in default of the JOA. Accordingly,

IT IS ORDERED that Pittencrieff's Motion for Summary Judgment is GRANTED in part and DENIED in part.

---

7. Paragraph 23.2 of the JOA provides, in pertinent part, that:

In the event any Non–Operator should fail to pay its share of the charges, costs and expenses incurred under this Agreement within forty-five (45) days after actual receipt of a statement of same for any month, such Non–Operator shall be deemed delinquent. If after fifteen (15) days following *actual receipt of notice of delinquency by the Non–Operator* (or by an officer if the Non–Operator if it is a corporation), Operator has not received payment, or the Non–Operator has not made other arrangements for payment satisfactory to Operator, the delinquent Non–Operator shall be deemed to be in default.... (Emphasis added).